IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| GERI DAKIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 08-0794-CV-W-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Geri Dakin seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Title II of the Social
Security Act ("the Act"). Plaintiff argues that the ALJ erred
(1) in finding that plaintiff does not meet or equal Listing
11.03 dealing with seizures; (2) in failing to accord proper
weight to the opinion of plaintiff's treating physician, Dr.
Hollenbeck; (3) in finding plaintiff not credible; and (4) in
failing to satisfy his burden of establishing the existence of
alternative work plaintiff could perform despite her impairment.
I find that the substantial evidence in the record as a whole
supports the ALJ's finding that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be denied
and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On February 4, 2003, plaintiff applied for disability benefits alleging that she had been disabled since August 30, 2002.  Plaintiff's disability stems from Chiari malformation,[1] seizures, and back pain.  Plaintiff's application was denied on April 3, 2003.  On October 19, 2004, a hearing was held before Administrative Law Judge Guy Taylor.  On October 29, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  The Appeals Council remanded the case, and a second hearing was held on March 22, 2007.  The ALJ issued a second denial on May 22, 2007.  On August 22, 2008, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1]Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance. When the indented bony space at the lower rear of the skull is smaller than normal, the cerebellum and brainstem can be pushed downward. The resulting pressure on the cerebellum can block the flow of cerebrospinal fluid (the liquid that surrounds and protects the brain and spinal cord) and can cause a range of symptoms including dizziness, muscle weakness, numbness, vision problems, headache, and problems with balance and coordination. There are three primary types of CM. The most common is Type I, which may not cause symptoms and is often found by accident during an examination for another condition. Type II (also called Arnold-Chiari malformation) is usually accompanied by a myelomeningocele -- a form of spina bifida that occurs when the spinal canal and backbone do not close before birth, causing the spinal cord to protrude through an opening in the back. This can cause partial or complete paralysis below the spinal opening. Type III is the most serious form of CM, and causes severe neurological defects.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 850-51 (8th Cir. 2000); <u>Johnson v. Chater</u>, 108 F.3d 178, 179 (8th Cir. 1997); <u>Andler v. Chater</u>, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th

Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are

codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

    2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

    3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

    4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

    5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational experts Amy Salva and George McClellan, in addition to documentary evidence admitted at the hearing.

*A.    ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1981 through 2003 with no reported earnings after 2003:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1981 | $   753.75 | 1993 | $15,408.89 |
| 1982 | 0.00 | 1994 | 16,988.58 |
| 1983 | 704.00 | 1995 | 20,132.50 |
| 1984 | 1,841.63 | 1996 | 19,640.25 |
| 1985 | 327.78 | 1997 | 18,046.14 |
| 1986 | 3,637.00 | 1998 | 14,262.60 |
| 1987 | 3,849.33 | 1999 | 19,312.78 |
| 1988 | 1,129.55 | 2000 | 32,375.27 |
| 1989 | 0.00 | 2001 | 24,392.71 |
| 1990 | 0.00 | 2002 | 28,666.65 |
| 1991 | 861.75 | 2003 | 3,342.00 |
| 1992 | 9,681.45 | | |

(Tr. at 88-90, 320-322).

**Claimant Questionnaire**

In a claimant questionnaire dated February 12, 2003, plaintiff reported that she was having a hard time concentrating enough to help her kids with their homework; she had to take baths instead of showers because she would get wobbly standing

6

long enough to take a shower; she rarely cooked anymore and when she did it was frozen pizza, sandwiches, microwave meals, or Hamburger Helper (Tr. at 118-121). Plaintiff's husband and teenaged children did most of the cooking because of plaintiff's dizziness, lack of coordination, and vision problems. Plaintiff reported that she had to take someone shopping with her, but did not indicate why she could not shop alone. Plaintiff was able to dust and fold laundry. Plaintiff had trouble reading due to her difficulty seeing and concentrating. She reported sometimes having trouble seeing the television. Plaintiff had a valid driver's license but reported that her neurologist had suggested she not drive until he said it was OK. Plaintiff's children were 15, 13 and 5 at the time. She reported taking care of the five-year-old by getting her ready for preschool and fixing her breakfast and lunch.

**Claimant Questionnaire Supplement**

In a claimant questionnaire supplement dated March 10, 2003, plaintiff wrote, "I don't have much pain other than headaches." (Tr. at 130).

**Daily Activities Report**

In a July 26, 2004, report of her activities of daily living, plaintiff said she no longer had the energy or strength to bathe, change her clothes, or fix her hair on a regular basis

(Tr. at 137-143). She reported that she bathed once a week, she washed her hair once a week, and she never put on make-up. She reported that she was cooking once or twice a week, that she was able to get her daughter "to school & home from school". She said she was not doing housecleaning or laundry. She reported that she went to the grocery store twice a month with her daughter in case she got dizzy, blacked out, or got tired and needed help. It would take her 30 to 40 minutes to shop for groceries. Plaintiff had a valid driver's license but drove "very rarely."

Plaintiff reported that she would sleep 12 to 14 hours each night, and she was taking one- to two-hour naps "a couple times a day". She said she normally got up between 11:00 and noon, and that she normally went to bed around 9:00 to 10:00 p.m.

Plaintiff reported that her symptoms consisted of double vision; numbness in her arms, legs, and mouth; loss of coordination; memory loss; trouble concentrating; hard time staying awake; petit mal seizures; migraines; and pain in her neck from a bulging disc. She was not sure what brought on her symptoms, but she reported that trying to do too much or trying to stand up made her symptoms worse. She received physical therapy for her bulging disc, but "no other treatment for the other symptoms."

**B.    SUMMARY OF MEDICAL RECORDS**

On June 21, 2001, plaintiff saw Larry Hollenbeck, M.D., for a neurology consult (Tr. at 206-208).  Plaintiff reported smoking a half a pack of cigarettes per day.  Her mother had epilepsy. Plaintiff reported occasional headaches during menstruation, no visual complaints other than blurring while having a seizure. Dr. Hollenbeck scheduled a tilt table test.

On July 18, 2001, plaintiff saw Dr. Hollenbeck for a follow up (Tr. at 202).  "The patient states that, since being on Carbatrol, she has had only two episodes with loss of consciousness. . . .  She is taking Carbatrol 200 mg b.i.d. (twice a day) and reports no adverse side effects.  She did report a period of disorientation with the above episodes and had no warning before them. She had been arguing with her husband on both occasions."

On January 28, 2002, plaintiff saw Scott Kuennen, M.D., complaining of back pain radiating into her right leg with some numbness in her foot (Tr. at 157).  The symptoms had been present "since 1/20/02".  She said that her back "went out" while she was crouching down while cleaning.  She was having difficulty standing, sitting, or lifting.  The doctor noted that a review of symptoms other than the back pain was negative.  Plaintiff denied any extremity numbness, weakness, or tingling.  Plaintiff had no

tenderness, negative straight leg raising, and normal range of motion in her legs.  She had limited flexion and almost no ability for extension of the low back.  Dr. Kuennen assessed lumbar strain.  "Due to her hx [history] of multiple occurrences of LBP [lower back pain], we will get her set up for PT [physical therapy]."  He prescribed Naprosyn (non-steroidal anti-inflammatory) and Skelaxin (a muscle relaxer) for inflammation and spasm.

On March 27, 2002, plaintiff had a CT scan of her head due to complaints of sudden loss of vision (Tr. at 152).  The results were normal.  She also had an x-ray of her chest due to complaints of dizziness (Tr. at 153).  The results were normal.

August 30, 2002, is plaintiff's alleged onset date.

On December 28, 2002, plaintiff had an EEG due to complaints of increased seizure frequency (Tr. at 193).  "This is an abnormal EEG recording which demonstrates focal (partial) dysrhythmia[2] in the left mid temporal region.  These findings would suggest focal dysfunction or an irritative lesion in the left hemisphere.  Structural pathology involving the left hemisphere could also be considered."

On December 31, 2002, plaintiff had an MRI of the brain due to her complaints of seizures (Tr. at 192).  The results were

---

[2]An irregularity in the rhythm of brain waves.

normal.

On February 12, 2003, plaintiff saw Dr. Hollenbeck (Tr. at 190). Plaintiff reported that her seizures were improved, that she had an episode of feeling "spacy" about once or twice a day. "She still does not feel comfortable driving." Plaintiff's strength and gait were normal, and she had no ataxia.[3]  Dr. Hollenbeck assessed seizure disorder, complex partial type, somewhat improved with Keppra, an anti-epileptic drug.  He recommended she increase her dosage of Keppra and told her to come back in three months.

On March 17, 2003, Ian Belson, D.O., a neurologist, examined plaintiff in connection with her disability application (Tr. at 159-161).  Dr. Belson's report reads in part as follows:

> PAST MEDICAL HISTORY:  Ms. Dakin first began to experience seizures in June of 2001.  She was hospitalized, tests were done and it was decided that she was having epileptic seizures.  These seizures manifested themselves as staring spells and dizziness which had been happening for several years, however, in June she apparently had lost consciousness.  When she awoke, she was very confused. These spells have repeated themselves since that time. They are often heralded by dizziness, smelling something funny and also tasting something unusual.  She has had three of these spells while driving. Witnesses have recorded her having generalized major motor seizures.  She has daily staring spells and loss of awareness lasting anywhere from two to three minutes. EEG was done September 23 of last year, apparently was normal.  She has been taking Tegretol

_____

[3]Wobbliness, incoordination, and unsteadiness due to the brain's failure to regulate the body's posture and regulate the strength and direction of limb movements.

300 mg twice per day and 400 mg at bedtime, Keppra 250 mg in the morning and 500 mg at bedtime.

NEUROLOGICAL REVIEW:  Positive for headaches which she has had for years.  She will have a disabling headache about once or twice per month.  Has some dizziness and she has been told in the past that this was possibly Menier's.[4]  Has memory concentration difficulties associated with her spells.  Relates some degree of anxiety and sadness. Occasional double vision. . . .  There is some incoordination. She has had problems with imbalance and occasional falls, some tingling in her mouth and extremities.  Patient denies any other pain complaints.

* * * * *

PERSONAL AND SOCIAL HISTORY:  Activity level is medium.  She smokes about three to four cigarettes per day.  Does not use alcohol . . .  Complains of excessive daytime sleepiness. . . .

* * * * *

CRANIAL NERVES:  . . .  The lower cranial nerves are grossly normal.

MOTOR EXAMINATION:  This reveals symmetrical strength, tone and coordination in upper and lower extremities with no evidence of atrophy or adventitious [accidental] movements. Gait is mildly unstable and she has difficulty doing tandem walking. There is subtle indication of mild ataxia [uncoordinated movements].

* * * * *

ASSESSMENT:
1.   Ms. Dakin's clinical neurologic examination demonstrates very mild gait instability which might limit her ability to climb or balance. . . .  Patient is on adequate medication, however, I do not have any recent blood levels to assess compliance.

---

[4]Menier's disease consists of four symptoms:  Periodic episodes of rotatory vertigo or dizziness; fluctuating, progressive, low-frequency hearing loss; ringing in the ear (tinnitus); and a sensation of "fullness" or pressure in the ear.

(Tr. at 159-161).

On March 27, 2003, Timothy Link, M.D., completed a Physical Residual Functional Capacity Assessment (Tr. at 165-172). He found that plaintiff had no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations other than that she should avoid all exposure to hazards such as machinery and unprotected heights.

On April 1, 2003, plaintiff was seen by Blake Donaldson, D.O., and reported lower back pain after a fall the previous week (Tr. at 260). Plaintiff had modest paravertebral lumbar tenderness, straight leg raising was negative. She was given anti-inflammatories.

On April 23, 2003, plaintiff saw Dr. Hollenbeck (Tr. at 187). She reported she thought her seizures were worse, that she was having seven to ten a day. She reported some diplopia (double vision). Dr. Hollenbeck found plaintiff's seizure disorder not well controlled. He ordered a 24-hour ambulatory EEG.

On April 28, 2003, plaintiff had a 24-hour ambulatory EEG due to her complaints of seizures (Tr. at 177). The results were normal. "In particular, no paroxysmal or epileptiform activity was identified."

On July 30, 2003, plaintiff saw Dr. Hollenbeck (Tr. at 186). She said she fell and hurt her back about a week earlier. She reported that her seizures were better over the last few weeks. The record also says that plaintiff was having seizures two to three times a day where she would have a "spell - stare." Dr. Hollenbeck assessed "seizure disorder - improved somewhat" and lower back pain. He prescribed Skelaxin, a muscle relaxer, and increased plaintiff's Keppra.

On August 4, 2003, plaintiff had x-rays of her lumbar spine which were normal (Tr. at 185, 222).

On December 11, 2003, plaintiff saw Dr. Hollenbeck for a follow up on her seizure disorder (Tr. at 184). "She really is uncertain whether she has been having any seizures. She has been under a great deal of emotional stress. Her son was found to be abusing various drugs and is in counseling for that. That has caused her a lot of stress and she has basically been sleeping most of the day in order to escape her problems." Plaintiff complained of "pretty severe and frequent migraine headaches." On exam, plaintiff had full strength in all extremities. There was no ataxia.[5] Dr. Hollenbeck assessed migraine headaches, depression, and seizure disorder "essentially stable." He

---

[5]Wobbliness. Incoordination and unsteadiness due to the brain's failure to regulate the body's posture and regulate the strength and direction of limb movements.

started her on Lexapro for depression and Relpax for migraines. She was to continue Keppra and Tegretol[6] without change.

On April 2, 2004, Larry Hollenbeck, M.D., completed a residual functional capacity assessment (Tr. at 180-182). He found that plaintiff could occasionally lift up to 20 pounds, and could frequently lift no weight. Plaintiff could sit for one hour per day and could stand or walk for one hour per day. She must periodically alternate sitting and standing or walking every 15 minutes. She could occasionally use her feet for operating leg controls. He found that plaintiff could frequently grasp, push, pull, reach, and handle and that she could occasionally finger and feel. Plaintiff could occasionally bend, climb, balance, stoop, kneel, crouch, crawl, or squat. She could frequently reach overhead and extend her arms. He found that plaintiff should avoid concentrated exposure to wetness, humidity, noise, and vibration; avoid even moderate exposure to extreme cold or extreme heat; and avoid all exposure to fumes, odors, dust, gases, poor ventilation, unprotected heights, and moving machinery. Dr. Hollenbeck found that plaintiff had no visual limitations. He found that she never complained of shortness of breath, she occasionally complained of vertigo, she

---

[6]An anticonvulsant. It works by decreasing nerve impulses that cause seizures and pain.

frequently complained of pain, and she continually complained of fatigue.

On April 21, 2004, plaintiff saw Dr. Hollenbeck and reported having had a "spell" (Tr. at 254). She was alone, felt an aura, and woke up on the floor. Dr. Hollenbeck assessed seizure disorder, recurrent, and neck pain. He ordered an MRI of plaintiff's cervical spine.

On April 27, 2004, plaintiff had an MRI of her cervical spine (Tr. at 252). The results were consistent with a left-sided disc protrusion at C3-C4, minimal disc bulging at C4-5 and C5-6.

Plaintiff participated in physical therapy for a bulging disc in her neck on June 1, 2004, and June 4, 2004 (Tr. at 217). She canceled her appointment on June 8, 2004, but gave no reason. She participated on June 10, 2004. On June 10, plaintiff rated her pain a 1 out of 10.

Plaintiff participated in physical therapy on June 15, 2004 (Tr. at 216). On June 17, 2004, she called and rescheduled her appointment. The following day, plaintiff called and canceled again, saying her son had run away the night before. When she returned on June 21, 2004, she said she had not done her exercises due to family problems. Plaintiff participated on June 24, 2004, but on June 28, 2004, she did not show up and did not

call (Tr. at 216).

Plaintiff participated in physical therapy on June 29, 2004; June 30, 2004; July 6, 2004; and July 8, 2004 (Tr. at 214). Plaintiff reported on July 6, 2004, that she had had a stressful weekend. Plaintiff's pain was described as a 2 to 4 out of 10 during this time period. She canceled her appointment on July 12, 2004 (Tr. at 214).

Plaintiff attended physical therapy on July 20, 2004; July 22, 2004; and July 28, 2004 (Tr. at 213). Plaintiff failed to show up and did not call on August 2, 2004. She showed up on August 4, 2004, and said she had experienced a lot of stress over the weekend (Tr. at 213).

On August 9, 2004, while at Northland Physical Therapy, plaintiff complained of having a bad sunburn (Tr. at 210). Plaintiff attended physical therapy on August 11, 2004. The next appointment, on August 16, 2004, was canceled by plaintiff who said she was ill. Plaintiff canceled her next appointment on August 18, 2004, again saying she was ill. Plaintiff failed to show up on August 19, 2004, and failed to call (Tr. at 210).

On August 31, 2004, plaintiff saw Nathan Granger, M.D., complaining of sore throat, sinus pressure, and left ear pain (Tr. at 257). Plaintiff was assessed with sinusitis, was given an antibiotic, and was told to stop smoking.

On September 2, 2004, plaintiff was discharged from physical therapy (Tr. at 252). Her prognosis was good, and plaintiff had reported feeling better on her last visit, August 11, 2004. "There was no formal d/c [discharge] secondary to patient cancelling/not showing for last 3 appointments. . . . She will be discharged from our care secondary to expired script."

On September 9, 2004, plaintiff saw Dr. Hollenbeck (Tr. at 250). "She thinks her seizures have been doing well. She is on Tegretol 300 mg. twice a day and 400 mg. at hs [bedtime]. She is also taking Keppra 500 mg. a.m. and 1000 mg. hs. With these medicines she does feel very sleepy and sleeps a lot during the day. She has also been sick with the flu and strep throat as well as sinus infections. . . . She complains of numbness and tingling in the extremities which occurs after she takes the Tegretol. Her neck pain has continued. Physical therapy did help somewhat. She has MRI evidence of a left-sided disc protrusion at C3-4." Dr. Hollenbeck found plaintiff's seizure disorder well controlled "although her medications are causing sedation" and cervical disc disease. He recommended a neurosurgical opinion about plaintiff's herniated disc and a trial of Provigil for somnolence, and told plaintiff to return in four months.

On September 23, 2004, plaintiff saw Dr. Granger and had an exercise stress test, x-rays, and lab work after complaining of sinusitis, dizziness, blurred vision, cough, migraine headaches, history of seizure disorder, history of bruising easily, neck pain, shortness of breath on exertion and tobacco use (Tr. at 361). Dr. Granger recommended plaintiff get regular aerobic exercise, stop smoking, and continue her current seizure medications.

On September 28, 2004, plaintiff saw Dr. Granger for removal of some moles on her back (Tr. at 359). Dr. Granger's recommendations included regular exercise.

On November 8, 2004, plaintiff saw Clifford Gall, M.D., complaining of neck pain, and numbness in her hands and feet (Tr. at 354). Dr. Gall indicated that plaintiff's disc herniation was "not terribly impressive but certainly was there." There was no evidence of a myelopathy.[7] He believed she had a Chiari malformation based on her MRI, and he sent her for an additional MRI. "On examination she is quite normal." Dr. Gall recommended a Chiari decompression. Plaintiff decided to think about it and get back with Dr. Gall.

On December 2, 2004, plaintiff saw Gregory Zipfel, M.D., for a second opinion on treatment of her Chiari malformation (Tr. at

_____

[7]Any functional disturbance and/or pathological change in the spinal cord.

349-350).  Plaintiff reported numbness in her hands and feet for the past two to three years, gait instability for the past two years, migraine headaches for 15 years, and neck pain for the past year.  She reported intermittent diplopia (double vision) and a history of petit mal seizures[8] since 2001.  "There is also evidence of a C3-4 central disc herniation, which causes mild compression of the thecal sac, but there is no significant stenosis (narrowing) here."  Plaintiff said she was still smoking but rarely consumed alcohol.  She was 5 feet 3 inches tall and weighed 128 pounds.  On exam, plaintiff had excellent short-term and long-term memory and normal concentration and attention.  Her cervical spine MRI revealed a C3-4 disc herniation causing moderate compression of the thecal sac, "but does not appear to impact the cord itself."  Dr. Zipfel stated that it was possible, although not likely, that the C3-4 disc herniation was contributing to plaintiff's myelopathy.  He indicated that some of plaintiff's symptoms were related to cervical myelopathy such as intermittent numbness in her hands and feet and her mild difficulties with stability.  He did not believe that the C3-4 disc herniation was the cause of plaintiff's symptoms and recommended conservative management for the disc herniation.

---

[8]A petit mal seizure, also known as an absence seizure, consists of a momentary break in consciousness of thought or activity, often accompanied by automatisms or clonic movements, especially of the eyelids.

"[T]he main reason for surgical intervention is to stabilize her early cervical myelopathy to prevent progression. I have indicated that her mild gait instability and her symptoms of numbness in her hands and feet may improve after surgery, but this is not assured. I have indicated that her symptoms of dizziness, diplopia, migraine headaches and neck pain are most likely not going to improving [sic] following surgery."

On December 29, 2004, plaintiff underwent a Chiari decompression at Barnes Jewish Hospital performed by Dr. Zipfel (Tr. at 336-343). Dr. Zipfel believed this procedure would help with plaintiff's bilateral hand numbness, gait difficulties, and cervical myelopathy. Prior to surgery, plaintiff had an MRI of her cervical spine which showed left paracentral disc herniation at C3-4 extending into the left neural foramen causing foraminal narrowing and left C4 nerve compression (Tr. at 342-343).

On January 6, 2005, plaintiff saw Dr. Granger to have her sutures removed (Tr. at 352). He refilled her Percocet (narcotic) for pain, and he refilled her Soma (muscle relaxer) for spasm.

On January 26, 2005, plaintiff saw Dr. Hollenbeck for a follow up of seizure disorder (Tr. at 403). "Her seizures have been well controlled. She remains on Tegretol and Keppra at the same doses." Plaintiff was one month status post Chiari

decompression. "She is doing fairly well but does complain of continued neck stiffness. . . . Occasional numbness and diplopia remain." Plaintiff had full strength in all extremities. No cerebellar ataxia was noted (an irregularity in the rhythm of brain waves). Dr. Hollenbeck assessed "seizure disorder, well controlled on present medications." He recommended she continue with the same doses of medication and come back in about four months.

On February 10, 2005, plaintiff saw Dr. Zipfel for a follow up (Tr. at 348). Plaintiff reported that her hand numbness had resolved and that she was no longer having significant balance difficulties. Her pre-existing headaches had not resolved. Plaintiff had normal range of motion and normal gait. "Ms. Dakin is doing quite well following her surgery. . . . It is possible that over time her headaches will improve; however, it is also possible that these headaches are unrelated to her Chiari malformation." Dr. Zipfel indicated that he did not see any reason for further follow up but would see plaintiff on an as-needed basis.

On June 2, 2005, plaintiff saw Dr. Hollenbeck (Tr. at 402). She reported headaches "really bad. Went for follow up in St. Louis, 'won't go [sic] be going back there.'" Plaintiff was taking Motrin which was upsetting her stomach. As far as

seizures, plaintiff reported "none really". Dr. Hollenbeck assessed "seizures, stable".

On October 20, 2005, plaintiff saw Dr. Hollenbeck (Tr. at 401). She reported having "no seizures." Plaintiff was still having bad headaches and she reported diplopia (double vision). Plaintiff had decreased range of motion in her shoulder. Dr. Hollenbeck assessed seizures, stable, and left shoulder pain. He recommended an MRI of plaintiff's neck and shoulder and told her to continue her same medications.

On November 2, 2005, plaintiff had an MRI of her cervical spine (Tr. at 399). The radiologist compared it to plaintiff's MRI dated April 27, 2004. He found degenerative changes in the cervical spine "probably not significantly changed since the previous examination". He wrote that "definite cord compression is not identified though may be present." He suggested possibly getting higher resolution images. Plaintiff also had an MRI of her left shoulder (Tr. at 400). Dr. Lavin stated that plaintiff could have a small partial tear or a small fluid collection associated with the joint. "No narrowing of the subacromial space is identified."

On December 16, 2005, plaintiff completed a patient history at Liberty Orthopedics (Tr. at 454). She was asked to check "yes" or "no" as to whether she had or presently suffers from

various conditions.  She checked "no" with regard to visual loss and depression/anxiety.

That same day plaintiff saw Richard Curnow, M.D., at Liberty Orthopedics due to shoulder pain and intermittent numbness of the fingers on her left hand (Tr. at 455).  These symptoms began in approximately August 2005.  "She has been seen by another orthopedist that she did not seem to get along with and came here for another evaluation."  Plaintiff was noted to be a smoker. Her general physical exam was unremarkable.  She had full range of motion in her neck and shoulder.  X-rays were normal, but plaintiff had a positive Tinel's sign.[9]  Plaintiff was told to go back to her neurosurgeon.

On February 23, 2006, plaintiff saw Dr. Hollenbeck (Tr. at 397).  She said her seizures were better, she was having about one per week.  She reported that she was not driving.  Plaintiff reported having shoulder pain and a headache every morning for which she took two Excedrin.  She was assessed with "seizures, stable" and left shoulder pain.  Dr. Hollenbeck told plaintiff to continue her same medications and come back in about three to four months.

---

[9]A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve.

On June 18, 2006, plaintiff went to the emergency room due to knee pain from falling sometime earlier (Tr. at 389-394). She said her knee did not twist, but it hit the concrete. She denied any back pain, "all other review of systems are negative at this time." She was smoking four to five cigarettes per day. She was taking Tegretol (for seizures), Keppra (for seizures), Mobic (non-steroidal anti-inflammatory for neck pain), Xanaflex (muscle relaxer for neck pain), and Zomig nasal spray (for headaches) "She is ambulating with only slight antalgic gait.[10] This seemed to improve throughout her stay here in the ER." An x-ray revealed no fractures. Plaintiff was given a prescription for Vicodin (a narcotic) and was also given two Vicodin prior to discharge from the ER. "She did not take these, however, because she is driving this evening."

On June 20, 2006, plaintiff saw Robert Buzard, M.D., for a follow up on her knee (Tr. at 441). She said she fell at home on June 8, 2006; went to the emergency room but had no fracture; and continues to have pain causing a limp. Dr. Buzard ordered an MRI.

On June 22, 2006, plaintiff completed a patient history at Liberty Orthopedics (Tr. at 452). She was asked to check "yes" or "no" as to whether she had or presently suffers from various

---

[10]A limp adopted so as to avoid pain on weight-bearing structures.

conditions.  She checked "no" with regard to visual loss and depression/anxiety.

On June 30, 2006, plaintiff was seen by Richard Curnow, M.D., at Liberty Orthopedics complaining of knee pain for the past three weeks (Tr. at 447).  Plaintiff had been using crutches during that time. Dr. Curnow ordered an MRI to rule out meniscal tear.  The MRI revealed a small area of radial tearing (Tr. at 448).

On July 5, 2006, plaintiff saw Dr. Monahan for treatment of her knee injury (Tr. at 446).  "Due to Ms. Dakin being a young, active person, we discussed treatment alternatives which would include possible repair of the meniscus versus resection of the damaged area."  Plaintiff opted for surgery.

On July 10, 2006, plaintiff saw Dr. Hollenbeck (Tr. at 396, 502).  She reported her seizures were "doing OK".  She reported almost daily headaches in the back of her head.  Dr. Hollenbeck assessed "seizures, improved" and posterior headaches.  He recommended she return in six months.

On July 20, 2006, plaintiff had surgery on her knee to correct a meniscal tear (Tr. at 433-434, 446).

On July 20, 2006, plaintiff went to the Emergency Room at Liberty Hospital after experiencing "chest heaviness" and shortness of breath (Tr. at 404-405, 410-429, 505-506).

Plaintiff was smoking about one pack of cigarettes per day. Resting EKG was normal, cardiac enzymes were normal, chest x-rays were normal. A CT angiography was done to check for pulmonary embolism due to her recent knee surgery; it was normal. Plaintiff had had a migraine on July 20, the day of her knee surgery, but was given Zomig. Her discharge diagnosis was abdominal pain and nausea/vomiting.

On July 26, 2006, plaintiff saw Robert Buzard, M.D., for a follow up after her hospitalization (Tr. at 436-437). Plaintiff reported smoking a pack of cigarettes a day for the past 10 to 15 years. Plaintiff had no neck tenderness. Dr. Buzard assessed Costochondritis Tietzes syndrome, which is inflammation of the cartilage where ribs attach to the breastbone, causing chest pain.

On July 31, 2006, plaintiff saw Timothy Monahan, M.D., at Liberty Orthopedics for a follow up on her knee (Tr. at 445). Dr. Monahan instructed plaintiff on straight leg raising exercises to do at home and told her to avoid squatting or stairs.

On August 21, 2006, plaintiff saw Dr. Monahan for a follow up on her knee (Tr. at 445). She had full range of motion but continued to have some pain. Dr. Monahan reviewed strengthening exercises and recommended physical therapy.

On August 24, 2006, plaintiff began physical therapy for her knee (Tr. at 465-469). "Overall rehabilitation potential is good." Plaintiff was to attend physical therapy for five weeks. She told her physical therapist that she was not working due to another medical condition, and that she was not doing laundry because she had been told by her doctor to avoid stairs.

On October 18, 2006, plaintiff was discharged from physical therapy due to non-compliance (Tr. at 458-459). The percentage of goals met was zero. "Pt had poor attendance due to reported illness and daughter illness. Several attempts made to re-schedule".

On December 11, 2006, plaintiff saw Dr. Hollenbeck for a follow up (Tr. at 501). The report says her seizures were "not too bad". She complained of diplopia, not every day. Dr. Hollenbeck assessed "seizures - stable, well controlled".

On December 26, 2006, plaintiff saw Dr. Buzard and complained of back pain (Tr. at 492-494). Plaintiff said her pain began four days ago and she rated it an 8 out of 10. The pain was described as constant. "Patient denies all symptoms in all systems except as noted." After an exam, Dr. Buzard assessed low back pain. He prescribed Naprosyn (non-steroidal anti-inflammatory) and Flexeril (muscle relaxer).

On January 2, 2007, plaintiff saw Dr. Buzard for a follow up on back pain (Tr. at 489-491). Plaintiff reported that the pain was constant, and she rated it a 5-6 out of 10. "Patient denies all symptoms in all systems except noted." On exam plaintiff had bilateral lower paraspinal muscle tenderness, mildly reduced extension, moderately reduced flexion, and moderately reduced lateral motion bilaterally. Dr. Buzard assessed back pain and ordered an MRI.

On January 12, 2007, plaintiff saw Dr. Buzard to discuss her MRI results (Tr. at 487-488, 495). The MRI was "fairly unremarkable." Plaintiff was still smoking one pack of cigarettes per day (Tr. at 487). Plaintiff's gait, station, and posture were normal. She had full range of motion in her lower back with minor tenderness in the paralumbar muscles. Straight leg raising was negative. Dr. Buzard assessed low back pain but did not change any medication. "[C]ontinue to monitor for complications."

On January 19, 2007, plaintiff saw Shavonne Danner, M.D., for consultation regarding left leg pain (Tr. at 482-485). She reported significant pain since December 22, 2006. Plaintiff reported that her last petit mal type seizure had been three months earlier (Tr. at 482, 483). After performing an exam, Dr. Danner assessed lumbar radiculopathy L5 left and sacroiliitis,

left.  Dr. Danner performed a transforaminal injection at L5 and
L6 (Tr. at 480-481).  She directed plaintiff to attend outpatient
rehabilitation services for lumbar radiculopathy (Tr. at 473).

On January 23, 2007, plaintiff reported that her back pain
began on December 22, 2006, while sitting on the floor wrapping
presents (Tr. at 474-475).  Staying in one position aggravated
her pain; changing positions and using Ibuprofen gave her pain
relief.  A physical therapy plan was developed which was to take
place over the next 30 days.

Plaintiff had a second transforaminal injection at L-5 and
L-6 (Tr. at 477-470).  Dr. Danner wrote, "The patient returns and
has had 35% improvement with her transforaminal injection.  As
you know she has bulging disk disease, but no nerve root
compression.  It was not clear that injection intervention would
make a great deal of difference for her.  Certainly she is seeing
improvement."

On February 14, 2007, Dr. Hollenbeck completed a Medical
Source Statement (Tr. at 496-498, 509-511).  He found that
plaintiff could lift less than ten pounds frequently and about
ten pounds occasionally.  She could sit for a total of one hour
per day and could stand or walk for a total of one hour per day.
Alternating sitting and standing every hour was necessary.  He
found that plaintiff could frequently push or pull with her legs,

grasp, handle, feel, reach overhead, and extend her arms out. She could occasionally push or pull, reach in all directions, finger, bend, climb, balance, stoop, kneel, crouch, crawl, and squat. She should avoid concentrated exposure to extreme cold, extreme heat, wetness and humidity. She should avoid even moderate exposure to noise, vibration, fumes, odors, dust, gases, poor ventilation, unprotected heights, and moving machinery. Plaintiff had no limitation on hearing or speaking. Dr. Hollenbeck checked "yes" as to visual limitations but did not elaborate. He found that plaintiff has the following subjective symptoms: continual fatigue, frequent pain, and occasional vertigo. He indicated that these limitations had been present since at least August 30, 2002.

## C.   *SUMMARY OF TESTIMONY*

Hearings were held on October 19, 2004, and on March 22, 2007. Plaintiff testified at both hearings. Amy Salva, Vocational Expert, testified at the first hearing; and George McClellan, a vocational expert, testified at the second hearing.

## 1.   **Plaintiff's testimony.**

During the October 19, 2004, hearing, plaintiff testified as follows:

Plaintiff was 39 at the time of the hearing (Tr. at 544). Plaintiff was living in a house with a basement (Tr. at 544).

31

Plaintiff's husband and three children, ages 16, 15, and 6, were living with her (Tr. at 544).  She was 5' 2" tall and weighed 124 pounds (Tr. at 545).  She had a high school education and one year of college (Tr. at 545).

Plaintiff had a valid driver's license and would drive once every week or two within her town (Excelsior Springs) (Tr. at 544, 545).  She would drive to the grocery store which was four or five blocks from her house (Tr. at 545).  She was driving a 1999 Chevrolet Suburban (Tr. at 546).

Plaintiff last worked on August 31, 2002 (Tr. at 546).  Plaintiff's alleged onset date is August 30, 2002, because that was the day her doctor, Dr. Hollenbeck, told her not to go back to work (Tr. at 546).  Plaintiff was having seizures and was blacking out while driving (Tr. at 546, 552).

The $28,666 that was reported as income in 2002 was not earned, it was disability payments from MetLife (Tr. at 549-550).  MetLife stopped paying her in February 2003, and at the time of the administrative hearing, she had a lawsuit going as a result (Tr. at 550).  Plaintiff got disability based on her doctor's finding of a seizure disorder, but the insurance company had a doctor review her case about every three months (Tr. at 550).  Even though the doctor did not release her to return to work in February 2003, MetLife stopped paying but did not say why (Tr. at

550-551).

Plaintiff was taking Tegretol and Keppra for her seizures (Tr. at 548).  The medications help some, but they have "really adverse side effects." (Tr. at 548).  Plaintiff does not know when she has a seizure, her kids usually tell her (Tr. at 549). The last time she had had a seizure was "probably a couple weeks ago." (Tr. at 549).  Plaintiff blanks out and misses part of what someone is saying to her; she does not lose consciousness (Tr. at 549).  Plaintiff testified that sometimes she has one to three petit mal seizures a week, other weeks she does not have any (Tr. at 561).

Plaintiff was experiencing migraines up to two to three times per week (Tr. at 552).  They can last one to two days (Tr. at 561).  She was taking Relpax for her headaches (Tr. at 552). In addition to the medication, plaintiff would lie down in a dark room and try to sleep off a headache (Tr. at 561).  Plaintiff was experiencing double vision a lot (Tr. at 553).  It would usually begin about 30 minutes after she took her medication and last for a couple of hours (Tr. at 553).  She thinks it is a side effect of her medication (Tr. at 553).  After she takes her Tegretol and Keppra, she has double vision; numbness in her legs, fingers, lips, and tongue; and she sleeps a lot (Tr. at 553).  She takes those medications three times a day (Tr. at 553).  When plaintiff

got the numbness in her legs, her knees would get rubbery and she had to hang onto a wall (Tr. at 561). She would fall quite a bit as a result (Tr. at 561).

Plaintiff was not able to stand for very long and she had to have something to hold onto (Tr. at 562). Her doctor told her not to lift more than five or ten pounds, but plaintiff rarely lifted anything (Tr. at 562). She was able to grab things, but she had to hold onto them with both hands (Tr. at 563).

Plaintiff took Lexapro for a few months for depression (Tr. at 553-554). Dr. Hollenbeck prescribed it (Tr. at 554). After she took it, she would hear voices, so she stopped taking it (Tr. at 554).

Plaintiff took Bextra[11] for neck pain (Tr. at 555).

Plaintiff testified that she would normally get up around 7:45 a.m. (Tr. at 555). Plaintiff would sit on the couch and make sure her six-year-old daughter got dressed and on the bus (Tr. at 555). Plaintiff made sure her daughter's back pack had everything in it (Tr. at 555). Her daughter would make her own waffles in the toaster (Tr. at 555). Once her daughter was gone, plaintiff would take her medicine and go back to sleep (Tr. at 555-556). She slept until about 2:30 or 2:45 p.m. (Tr. at 556). Plaintiff would wake up just in time for her daughter to get off

_____

[11]Non-steroidal anti-inflammatory. Bextra was withdrawn from the U.S. market in 2005.

the bus (Tr. at 556). Plaintiff thought her medication caused her to sleep so much (Tr. at 556).

Plaintiff was able to take care of her own personal hygiene, but she did not do it as often as she should (Tr. at 556). When her daughter got home, she would read a book to plaintiff (her daughter was in first grade) as part of her homework (Tr. at 556). Plaintiff would try to do some dishes but would not usually finish (Tr. at 556).

Plaintiff's son and husband were doing the cooking (Tr. at 557). After dinner she would just lie around (Tr. at 557). Plaintiff does not visit anyone, she does not do any exercise (Tr. at 557). Plaintiff said she would like to see a counselor, but she did not have any way of getting to regular appointments (Tr. at 558). She could not get there because she did not have regular transportation since her husband was working (Tr. at 559).

Plaintiff was not able to go to any of her kids' activities (Tr. at 564). Plaintiff's daughter was a cheerleader but plaintiff had never seen her daughter cheer (Tr. at 564).

Plaintiff loses concentration a lot (Tr. at 559). She does not drink and does not use drugs (Tr. at 560).

During the March 22, 2007, hearing, plaintiff testified as follows:

Plaintiff was 41 years of age at the time of the hearing (Tr. at 581). Plaintiff was living with her husband and two children, ages 17 and 9 (Tr. at 582). Plaintiff had a valid driver's license but drove "very, very rarely" which she described as once every two or three months and only in an emergency, such as to the pharmacy (Tr. at 582-583).

Plaintiff's last job was working as a customer service representative for Citi Bank in August 2002 (Tr. at 583). She left that job and went on company disability due to seizures (Tr. at 583). Plaintiff received those disability payments for about six months (Tr. at 584).

Plaintiff was taking Tegretol and Keppra to treat seizures (Tr. at 584). Although the medications helped, she still had seizures with her last one being about a week before the hearing (Tr. at 584). When she has a seizure, she stares off into space and blocks out everything (Tr. at 585). The seizures last one to two minutes (Tr. at 585). Plaintiff had been having about seven to ten seizures per month (Tr. at 585). After a seizure, plaintiff feels wobbly and groggy for about five to ten minutes (Tr. at 585). When the ALJ asked plaintiff about a medical record from Liberty Hospital dated January 19, 2007, where it said plaintiff had a petit mal seizure "three months ago", she said that there was a three- to four-month period of time when

36

she did not have any seizures (Tr. at 591). When the seizures came back, plaintiff called Dr. Hollenbeck's nurse, but she did not go see the doctor (Tr. at 592).

Plaintiff continues to have migraines three to four days a week (Tr. at 586). She has medication to take at the onset of a migraine (Tr. at 586). Her last migraine was three days before the hearing and it lasted 24 hours (Tr. at 586). While she has a migraine, she lies in a dark room (Tr. at 587).

Plaintiff has constant neck and shoulder pain for which she takes an anti-inflammatory (Tr. at 587). She rated her shoulder pain a five on a scale of one to ten and her neck pain a seven (Tr. at 587). Plaintiff takes only anti-inflammatories and muscle relaxers; she prefers not to take pain medication (Tr. at 597-598). Plaintiff takes Naprosyn, which is an anti-inflammatory, and it causes an upset stomach sometimes (Tr. at 598). Her doctor switches her back and forth between Naprosyn, which works well but upsets her stomach, to Mobic which is easier on her stomach but does not work as well (Tr. at 599). Plaintiff has back pain which radiates down the side of her hip to her knee (Tr. at 613). She experiences this "off and on" (Tr. at 613).

Plaintiff had surgery for Chiari malformation in December 2004 (Tr. at 587-589). The symptoms improved a little bit, but they all came back progressively beginning sometime after

February 2005 (Tr. at 589).  When she told her doctor in February 2005 that her symptoms had resolved, it was soon after surgery and she was still on a lot of pain medication (Tr. at 589).  Dr. Zipfel is a neurosurgeon at Barnes-Jewish Hospital in St. Louis (Tr. at 591, 606).  He did the surgery in December 2004 (Tr. at 591).  Plaintiff returned to see him in February 2005, but she did not go back after that (Tr. at 591).  She went to see her regular neurologist instead, Dr. Larry Hollenbeck (Tr. at 591).

Plaintiff continues to suffer from double vision which occurs several times per day (Tr. at 594).  Plaintiff spoke to Dr. Hollenbeck about the double vision when she was first put on Tegretol and Keppra (before August 2002) (Tr. at 595). Since then, he asks her if anything has changed, and she says "no" but assumes by that answer that he knows she continues to have double vision (Tr. at 595).  Plaintiff has never been treated for double vision (Tr. at 596).

Plaintiff's medications cause severe sleepiness and dizziness (Tr. at 599). She talks to Dr. Hollenbeck about these side effects "all the time" (Tr. at 599).

Plaintiff normally gets up around 8:30 (Tr. at 600).  She sees her daughters off to school, eats cereal, and then lies back down (Tr. at 600).  Plaintiff has to get up every hour to move around, even during the night (Tr. at 600).  She does no

housework, she does no cooking other than microwaving (Tr. at 600). Plaintiff relies on her 17-year-old daughter to do the housework (Tr. at 601). Plaintiff spends her entire day trying to get caught up on her sleep because she can only sleep an hour at a time (Tr. at 601). Her pain wakes her up (Tr. at 601). Plaintiff goes to bed for the night around 8:30 or 9:00 p.m. (Tr. at 601-602). When she sits, she can only sit for an hour before having to get up and move around (Tr. at 602-603).

Plaintiff has experienced dizzy spells since her early 20's (Tr. at 603-604). She can reach and hold things if her hands are not numb and tingling (Tr. at 604). Although the surgery in 2004 improved the numbness, it came back about six months later (Tr. at 604). She talks to Dr. Hollenbeck about these symptoms "all the time" but he does not know much about Chiari (Tr. at 605). Plaintiff testified that Dr. Zipfel knows more about it because he specializes in Chiari, but she does not go see him because it is a long drive and she cannot afford it (Tr. at 605). She sees Dr. Hollenbeck about every four months because that is what she can afford (Tr. at 605).

Plaintiff gets severe car sickness, and has her entire life (Tr. at 607). Using a computer gives her a severe headache (Tr. at 606). Fumes and odors give plaintiff migraines (Tr. at 60). Plaintiff can pick up under ten pounds from a table (Tr. at 607).

She could physically make herself pick up something off the floor, but it would hurt her back (Tr. at 608). Plaintiff cannot climb stairs due to her knee; her washer is in the basement but her husband and daughter do the laundry (Tr. at 608). Plaintiff has problems with her balance; she wobbles and runs into walls (Tr. at 609). This happened two days earlier when she ran into a wall (Tr. at 609). Plaintiff cannot walk more than a block (Tr. at 611). She can stand still only five minutes (Tr. at 611). If she could periodically walk, she could stand for 15 to 20 minutes (Tr. at 611). She can sit for 30 minutes at a time (Tr. at 611).

**2.  Vocational expert testimony.**

During the October 19, 2004, hearing, vocational expert Amy Salva testified at the request of the Administrative Law Judge. The first hypothetical involved a person about age 39 with at least a high school education who could perform sedentary work but would require a sit-stand option every 15 minutes; would need to avoid concentrated exposure to humidity, noise, and vibration; and would need to avoid even moderate exposure to cold and heat (Tr. at 567). The vocational expert testified that such a person could work as an assembler, with 800 positions in Kansas City and 40,000 in the country; a cashier, with 900 in Kansas City and 160,000 in the country; or an information clerk, with approximately 130 in Kansas City and 16,000 in the country (Tr.

at 568, 570).

The second hypothetical consisted of a person with the same limitations as in the first hypothetical but who could only occasionally finger or feel and would need to avoid all exposure to fumes, dust, odors, and hazards (Tr. at 568-569).  The vocational expert testified that the person could still perform the position of information clerk with these additional limitations with approximately 300 positions in Kansas City and 75,000 in the country (Tr. at 569-570).

If the person lost awareness of what was going on around her for any length of time, she would not be able to perform the surveillance systems monitor job or the cashier job (Tr. at 571).

Generally, entry level positions allow for one sick day per month (Tr. at 572).  None of these positions would allow for a person to lie down during the work day (Tr. at 572).

During the March 22, 2007, hearing, vocational expert George McClellan testified at the request of the ALJ.

The first hypothetical involved a person who could perform sedentary work; could lift and carry no more than ten pounds; could stand and walk no more than two hours per day; could sit six hours per day; would have an unlimited ability to push and pull; could not climb; could occasionally balance, stoop, kneel, crouch, or crawl; should avoid concentrated exposure to fumes and

odors; and should have no exposure to hazards such as dangerous machinery or unprotected heights (Tr. at 616). The vocational expert testified that such a person could perform plaintiff's past relevant work as a customer service representative, an accounting clerk, and a billing clerk (Tr. at 616).

The second hypothetical included all of the limitations in the first hypothetical but in addition the person could only occasionally handle and finger (Tr. at 616-617). The vocational expert testified that the person could not do any of plaintiff's past relevant work or any other work if "occasionally handle and finger" meant no more than two hours per day (Tr. at 617).

The third hypothetical included the limitations from the first hypothetical but the person would additionally need a sit-stand option at will (Tr. at 618). The vocational expert testified that the person could perform the same jobs as the person in the first hypothetical (Tr. at 618).

The fourth hypothetical included all of the limitations in the third hypothetical but also limited the person to performing only simple, unskilled, repetitive tasks (Tr. at 618). The vocational expert testified that such a person could not perform any of plaintiff's past relevant work but could work as an optical good assembler, DOT 713.687-018, with 1,200 in Missouri and 68,000 in the country; a surveillance systems monitor, DOT

379.367-010, with 1,000 in Missouri and 80,000 in the country; or a telephone solicitor, DOT 299.357-014, with 1,200 in Missouri and 50,000 in the country (Tr. at 619-620).

The fifth hypothetical involved a person with double vision and severe migraines three times per week (Tr. at 621-622). The vocational expert testified that the person could not work because of the need to lie down in a dark room when experiencing a migraine (Tr. at 622).

Finally, a person who could only sit for one hour per day and stand for one hour per day could not do any job (Tr. at 622).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Guy Taylor entered his opinion on May 22, 2007.

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date of August 30, 2002 (Tr. at 25). The earnings posted to her work record for 2003 are not presumptive of substantial gainful activity (Tr. at 25).

Step two. Plaintiff suffers from the following severe impairments: history of migraines; history of type 1 Chiari malformation, status post Chiari decompression on January 2, 2005; a seizure disorder; degenerative disc disease of the cervical and lumbar spines, with history of neck, shoulder, and low back pain radiating to the left hip and left leg; and an

43

injury to the left knee in July 2006, status post left meniscal tear repair on July 20, 2006 (Tr. at 25). Plaintiff's double vision is not a medically determinable impairment (Tr. at 25).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 25-26). Plaintiff did not argue a listed impairment at the administrative level (Tr. at 25).

Step four. Before determining whether plaintiff could return to her past relevant work, the ALJ analyzed her credibility and found her subjective complaints not entirely credible (Tr. at 26-31). He discredited the opinion of Dr. Hollenbeck, plaintiff's treating neurologist (Tr. at 31). He then found that plaintiff had the residual functional capacity to perform sedentary work; e.g., lifting and carrying up to ten pounds; standing and walking no more than two hours total in an eight-hour day with normal breaks; sitting no more than six hours total in an eight-hour day with normal breaks; unlimited pushing and pulling; no climbing; occasional balancing, stooping, kneeling, crouching, and crawling; should avoid concentrated exposure to fumes and odors; should not work around hazards such as unprotected heights or around dangerous or moving machinery; should be afforded a sit-stand option at will; and is limited to simple, unskilled, repetitive job tasks (Tr. at 31-32).

With this residual functional capacity, plaintiff is unable to return to her past relevant work as a customer service representative, survey worker, accounting clerk, retail sales clerk, billing clerk, or waitress (Tr. at 32).

Step five. Plaintiff retains the residual functional capacity to be an optical goods assembler, a surveillance systems monitor, or a telephone solicitor (Tr. at 32). All of these jobs exist in significant numbers in the national economy and the regional economy (Tr. at 32).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v.

45

_Sullivan_, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ

explicitly discredits testimony and gives legally sufficient

reasons for doing so, the court will defer to the ALJ's judgment

unless it is not supported by substantial evidence on the record

as a whole. _Robinson v. Sullivan_, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit

plaintiff's subjective complaints is supported by substantial

evidence. Subjective complaints may not be evaluated solely on

the basis of objective medical evidence or personal observations

by the ALJ. In determining credibility, consideration must be

given to all relevant factors, including plaintiff's prior work

record and observations by third parties and treating and

examining physicians relating to such matters as plaintiff's

daily activities; the duration, frequency, and intensity of the

symptoms; precipitating and aggravating factors; dosage,

effectiveness, and side effects of medication; and functional

restrictions. _Polaski v. Heckler_, 739 F.2d 1320, 1322 (8th Cir.

1984). Social Security Ruling 96-7p encompasses the same factors

as those enumerated in the _Polaski_ opinion, and additionally

states that the following factors should be considered:

Treatment, other than medication, the individual receives or has

received for relief of pain or other symptoms; and any measures

other than treatment the individual uses or has used to relieve

pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

[C]laimant testified that she could lift no more than 10 pounds, walk no more than 1 block, and stand and walk no more than 15 to 20 minutes before having to sit down for 30 minutes or more. Claimant noted that she had problems with balancing, and she could not tolerate fumes, noise, or vibration. Claimant, however, stated that she had no problems with writing or manipulating.

. . . [C]laimant has had a stable work history from 1993 until her alleged onset date. Despite the good work record for claimant for the above period, it is nonetheless noted that claimant received some disability payments from her former employer during the period in question, and these monies might have reduced her incentive to work somewhat.

In terms of activities of daily living, claimant, at the hearing, testified to a very restricted lifestyle. Herein, claimant noted that she did no household chores and the only cooking she did was some occasional microwave meals. Claimant also testified that she did not watch television or read because of her severe headaches and dizziness, and she did not go out of the house unless she had a doctor's appointment. Overall, claimant stated that she was lying down 1 hour at a time, repeatedly throughout the day and night.

In an activities questionnaire completed in February 2003, claimant reported that she did the grocery shopping with her husband or her sister. Household chores for claimant, according to that questionnaire, consisted of dusting and folding the laundry. Pleasurable activities consisted of watching television. Claimant noted she had a valid driver's license, but was not driving at that time. In an activities questionnaire completed in July 2004, claimant reported minimal activities. She noted then that she did not have the energy or strength to bathe or change clothes. Claimant did

report that she had a child that she had to get off to school in the mornings. No household chores were reported by claimant at that time. Claimant also stated then that she did not go grocery shopping. No hobbies, interests or social activities were reported by claimant at that time as well.

. . . The undersigned finds that claimant's activities of daily living, as testified to by her at the hearing and as shown on the 2004 activities questionnaire, wherein she refers to an extremely restricted lifestyle, are not consistent with the activities reported on the previous questionnaire completed by claimant in February 2003. More importantly, claimant's extremely restricted activities are not consistent with the medical objective findings of record, as will be discussed.

. . . Although claimant has testified to debilitating symptoms arising from her Chiari malformation, claimant has not returned to her neurosurgeon, Dr. Zipfel, whom claimant testified was more knowledgeable on this particular medical condition than Dr. Hollenbeck, her current treating neurologist. Moreover, although claimant, at the hearing, testified that she often presented to Dr. Hollenbeck with complaints of severe dizziness, double vision and sleepiness, the medical treatment records from that physician do not document the above-cited symptoms on any type of consistent basis by claimant. It is also noted that although claimant has testified to very frequent, seizure-like episodes (7 to 10 a month), the medical record does not support this allegation. . . . It is also noted that there are no records of any frequent hospital emergency room visits or inpatient hospitalizations for claimant with respect to any seizures or migraines during the period at issue. Additionally, although claimant has alleged debilitating cervical pain, she takes no prescriptive pain medication and relies mainly on muscle relaxants and anti-inflammatory medication. At the hearing, claimant testified that she did not want to take pain medication. The undersigned notes herein that a lack of strong pain medication is inconsistent with subjective complaints of disabling pain. There are also no records of any ongoing or consistent physical therapy, pain management, etc., for claimant with respect to her alleged debilitating cervical complaints, and none has been recommended by any physician of record or undertaken by claimant for several years,

except for some brief physical therapy following her left knee surgery in 2006.

. . . 2004 records from Northland Physical Therapy & Rehab Services, Inc., showed that claimant was improving with respect to her cervical complaints and she was described, on June 29, 2004, as "doing okay." On August 9, 2004, claimant reported "feeling better." Despite these good comments, claimant, nonetheless, on September 9, 2004, reported to Dr. Hollenbeck that the physical therapy had not improved her cervical complaints. It is noted that the examination at that time showed claimant to be neurologically intact. . . .

In a report dated December 2, 2004, Dr. Gregory J. Zipfel, claimant's neurosurgeon, reported that claimant had complaints of neck pain, which were sub-occipital in nature and radiated between her shoulder blades. Regarding the neck pain, Dr. Zipfel indicated that there were no inciting factors for this pain and there was no specific entity that led to relief. . . . Dr. Zipfel noted that MRI testing had shown a type 1 Chiari malformation with evidence for compression of the cervico-medullary function. He also noted that there was evidence of a C3-4 central disc herniation which caused mild compression of the thecal sac, but there was no significant stenosis found. Dr. Zipfel advised claimant that her examination had objective findings for cervical myelopathy. Due to these signs and symptoms, as well as her noted Chiari malformation, Dr. Zipfel recommended surgical intervention. . . .

. . . [F]ollowing the above surgery, the medical record does not indicate that claimant has followed up with Dr. Zipfel, her neurosurgeon, on any type of consistent basis. Claimant, at the hearing, testified that she had not seen Dr. Zipfel since her surgery and follow up in 2005. Additionally and as previously stated, although claimant testified to debilitating symptoms and noted at the hearing that her treating neurologist, Dr. Hollenbeck, was not as knowledgeable as Dr. Zipfel with respect to Chiari malformation, claimant has not sought any further treatment by Dr. Zipfel. It is noted that during a follow-up visit with Dr. Hollenbeck on January 21, 2005, claimant was reported to be doing fairly well at that time, albeit she complained of continued neck stiffness. . . . Cervical complaints were noted by claimant on a treatment record dated February 23, 2006. Nonetheless, the examination at

that time was essentially unremarkable. Claimant again presented with cervical complaints on July 10, 2006, and again, the examination was essentially unremarkable. . . .

. . . [A] CT scan of the head taken in March 2002 was negative. An MRI of the brain taken in December 2002 was essentially negative.

. . . [A]lthough claimant has alleged frequent and debilitating seizure-like episodes, the record does not substantiate these allegations. Specifically, a treatment note from Dr. Hollenbeck for September 9, 2004, showed that claimant's seizure disorder seemed to be well controlled although her medications were causing sedation. The neurological exam at that time was essentially unremarkable. . . .

On January 26, 2005, Dr. Hollenbeck noted that claimant's seizure disorder was well controlled on present medications. The examination at that time was essentially unremarkable. . . . No complaints of seizures were made by claimant at that time and she was reported to be doing fairly well. Claimant was to continue with the same doses of Tegretol and Keppra and follow up in 4 months. On June 2, 2005, treatment records indicate that claimant's seizure disorder was "stable." A treatment note for October 20, 2005, also showed no seizures for claimant. The neurological examination at that time was essentially unremarkable and again, claimant's seizure disorder was reported to be "stable." A treatment note for February 23, 2006, indicates that claimant's seizures were better controlled with the Keppra. Overall, it was noted then that claimant's seizures were "stable." A treatment record for July 10, 2006, showed claimant's seizures to be "improved."

. . . [T]he record does not show any consistent medical treatment with respect to claimant's alleged migraines. . . .

(Tr. at 26-31).

## 1.   *PRIOR WORK RECORD*

The ALJ found that plaintiff had a stable work history from 1993 to 2002 but that her receipt of disability payments from her

employer may have reduced her incentive to work.  See
Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004)
("[T]he ALJ . . . noted that [the claimant's] incentive to work
might be inhibited by her long-term disability check of $1,700
per month".)

## 2.   *DAILY ACTIVITIES*

The ALJ noted that plaintiff reported extremely limited
daily activities in her administrative paperwork and she
testified to extremely limited daily activities.  However, the
ALJ observed that there was objective medical evidence to the
contrary:  Dr. Hollenbeck's examination findings were essentially
normal in September 2004, January 2005, and February 2006.  He
consistently observed that plaintiff had full strength and intact
nerves and reflexes.  He observed no ataxia (wobbliness,
incoordination, unsteadiness) throughout the relevant period and
described plaintiff's gait as normal or "ok".  These medical
findings are inconsistent with plaintiff's allegation that she is
unable to bathe and change clothes regularly or that she could
perform no household chores.  In addition, Dr. Belson noted in
March 2003 that plaintiff's activity level was "medium."  On July
5, 2006, Dr. Monahan described plaintiff as being a "young,
active person."

Plaintiff complained to her physical therapist in August 2004 of having a "bad sunburn" which indicates that plaintiff was not lying in a dark room sleeping most of the day like she testified.  On June 18, 2006, plaintiff declined to take Vicodin when she was at the ER for her knee because she was driving that evening.

On August 24, 2006, plaintiff reported that she was not doing laundry -- not because she was too fatigued or disabled but because her doctor had told her not to climb stairs.  That restriction was placed on plaintiff on July 31, 2006, after she had surgery on her knee; approximately four years after her alleged onset of disability.  On March 22, 2007, plaintiff testified that she drove, albeit very rarely.

**3.    *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS***

In plaintiff's claimant questionnaire supplement, she wrote, "I don't have much pain other than headaches."  This is despite her claim during the hearings of disabling back, hip, and leg pain.  In her daily activities questionnaire, she noted that she was receiving physical therapy for a bulging disc but "no other treatment for the other symptoms" which included double vision; numbness in her arms, legs, and mouth; loss of coordination; memory loss; trouble concentrating; hard time staying awake; petit mal seizures; and migraines.  She testified in 2007 that

she had never been treated for double vision. Lack of treatment is inconsistent with the finding of a disabling impairment. Jones v. Chater 83 F.3d 823, 826 (8th Cir. 1996).

In March 2003 plaintiff told Dr. Belson that she has a disabling headache about "once or twice a month;" however, she testified that she had migraines several times per week.

While participating in physical therapy in 2004, plaintiff rated her neck pain a one out of ten (Tr. at 217) and a two to four out of ten (Tr. at 214).

**4.   *PRECIPITATING AND AGGRAVATING FACTORS***

Although plaintiff testified that either her condition or her medication causes her to sleep most of the day, she told Dr. Hollenbeck on December 11, 2003, that she had been sleeping most of the day in order to escape her problems which at the time included her son's drug abuse. In September 2004, plaintiff again reported feeling very sleepy and sleeping a lot during the day, but she had also been sick with the flu, strep throat, and sinus infections. It has never been established that plaintiff's drowsiness is caused by her medication, although it has been mentioned as a possibility.

**5.   *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

Plaintiff has consistently been treated with steady levels of the same anti-seizure medication which has resulted in a

stable condition for years. Her pain has been treated with nothing more than non-steroidal anti-inflammatories and muscle relaxers. For the most part, plaintiff has taken nothing stronger than over-the-counter medication for her migraines and headaches. In June 2005 plaintiff told Dr. Hollenbeck she was having "really bad" headaches for which she took over-the-counter Motrin. Dr. Hollenbeck did not prescribe anything stronger, nor did he recommend that she seek other treatment for her headaches which suggests the Motrin was working adequately. In February 2006 plaintiff was treating her headaches with Excedrin. In March 2007, plaintiff testified that she preferred not to take pain medication, instead relying on non-steroidal anti-inflammatories and muscle relaxers. However, her doctors never offered her anything stronger for her pain except for one time in the emergency room after a knee injury and for short periods of time after surgery.

Although there is some indication that plaintiff's medications cause her to be drowsy, the record also contains plaintiff's statements of sleeping a lot in order to avoid the emotional stress in her life. On September 9, 2004, Dr. Hollenbeck prescribed Provigil for somnolence. After that, there was no further treatment for somnolence and Dr. Hollenbeck never

adjusted plaintiff's medication in an attempt to reduce any
alleged drowsiness.

## 6. *FUNCTIONAL RESTRICTIONS*

There are almost no functional restrictions in the record.
Dr. Belson found a "very mild gait instability" which might limit
plaintiff's ability to climb or balance.  Dr. Link found that
plaintiff should avoid hazards such as machinery and unprotected
heights.  Dr. Monahan told plaintiff to avoid squatting and
stairs in July 2006 just a few days after knee surgery.

On the other hand, Dr. Granger recommended several times
during 2004 that plaintiff get regular aerobic exercise.

## B. *CREDIBILITY CONCLUSION*

Based on the <u>Polaski</u> factors discussed above, I find that
the substantial evidence in the record supports the ALJ's
credibility finding.  However, in addition, I point out that most
of plaintiff's exams and tests were normal over the years.  On
December 16, 2005, plaintiff's general physical exam was
unremarkable, she had full range of motion in her neck and
shoulder, and her x-rays were normal.  On August 1, 2006,
plaintiff had full range of motion in her knee.  On January 12,
2007, plaintiff's MRI was fairly unremarkable.  Her gait was
normal and she had full range of motion in her lower back.

Finally, there are other inconsistencies in the record that support the ALJ's credibility finding. For example, on July 26, 2004, plaintiff reported in a daily activities questionnaire that she only bathed and washed her hair once a week. However, over the next several years, no doctor, nurse, or physical therapist ever noted in any record that plaintiff appeared to have less-than-normal hygiene. As the ALJ pointed out, plaintiff testified that she talked to Dr. Hollenbeck "all the time" about her numbness, dizziness, etc., but he did not know much about Chiari and she could not afford to go back to Dr. Zipfel since it was a long drive to his office. This is inconsistent with plaintiff's ability to purchase enough cigarettes to smoke a pack a day for years. Plaintiff testified that she only sees Dr. Hollenbeck about every four months because that is all she can afford. However, Dr. Hollenbeck's medical records clearly state each time that plaintiff was to return in four to six months. There is no evidence that he believed she needed to be seen sooner but could not afford more frequent appointments.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not entirely credible.

*VII. LISTING 11.03*

Plaintiff argues in her brief that the ALJ erred in finding that plaintiff's impairments do not meet or equal Listing 11.03 based on her seizures.  The ALJ stated that "claimant's representative has not introduced evidence or advanced an argument supporting a conclusion that any of claimant's impairments meet or equal a listed impairment.  The undersigned, overall, finds that claimant does not have an impairment or combination of impairments that meets or equals any of the listed impairments" (Tr. at 25-26).  This was based on the following statements during the administrative hearing:  "[A]re you asserting that your client either meets or equals a listing?" (Tr. at 612).  Plaintiff's attorney replied, "None that I could find, Your Honor" (Tr. at 612).  Plaintiff, however, argues for the first time in her brief that she meets Listing 11.03.

Listing 11.0, Neurological, states in relevant part as follows:

> A. *Epilepsy.* In epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures.  At least one detailed description of a typical seizure is required.  Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena.  **The reporting physician should indicate the extent to which description of seizures reflects his own observations** and the source of ancillary information.  **Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available**.

Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment.  Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken.  When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels.

Should serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorption or metabolism of the drug.  Blood drug levels should be evaluated in conjunction with all other evidence to determine the extent of compliance.  When the reported blood drug levels are low, therefore, the information obtained from the treating source should include the physician's statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels.  Where adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of this medication must also be assessed.  Where documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level.

Specifically, listing 11.03, which plaintiff argues in her

motion applies in this case, states as follows:

11.03 Epilepsy - nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern including all associated phenomena, ***occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment [w]ith alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.***

(emphasis added).

Plaintiff argues that in 2002 she was experiencing one to two "syncope[12] episodes" daily. She also points out that she experienced episodes of "near syncope" after her surgery for Chiari malformation. The term "syncope" is used by her attorney in plaintiff's brief. Syncope means partial or complete loss of consciousness. However, plaintiff testified on October 19, 2004, that she does not lose consciousness (Tr. at 549). In any event, syncope or near syncope is not the sole criteria for establishing a listing under 11.03. For the reasons following, plaintiff has failed to establish that her impairment meets this listing.

1. Also required is "transient postictal[13] manifestations of unconventional behavior or significant interference with activity during the day." There is no evidence of any unconventional behavior or significant interference with activity during the day. The record shows that over a period of more than five years, plaintiff lost consciousness on only a handful of occasions. For the most part, her seizures consisted of feeling "spacy" or staring for one to two minutes. Staring or feeling

---

[12]Partial or complete loss of consciousness with interruption of awareness of oneself and one's surroundings. When the loss of consciousness is temporary and there is spontaneous recovery, it is referred to as syncope or, in nonmedical quarters, fainting.

[13]Postictal means occurring after a seizure or sudden attack.

"spacy" for one to two minutes does not establish a significant interference with activity during the day.

2.  The listing requires the physician to have observed the seizures which resulted in loss of consciousness and, if that has not happened, then "testimony of persons other than the claimant is essential" for a finding under this listing.  There was no testimony by anyone other than plaintiff.  Cf. Braswell v. Heckler, 733 F.2d 531, 533 (8th Cir. 1984) (the plaintiff's wife testified that his eyes become transfixed, he loses consciousness, and as he comes out of the seizure he is weak, white, and sweating; the seizures last several minutes and occur twice per day).

3.  The listing requires seizures occurring more than once weekly despite having been on medication for three months. During the time plaintiff claims she was having one to two syncope episodes daily, she was not on medication for seizures. During her June 21, 2001, visit with Dr. Hollenbeck (when she first reported the seizures), he prescribed Carbatrol.  On her next appointment, July 18, 2001, she said she had only had two seizures since being on Carbatrol.  On February 12, 2003, she said her seizures had improved, but she had one or two episodes of feeling "spacy" each day.  Feeling "spacy" does not satisfy the listing requirement for seizures.  The seizures must cause

alteration of awareness or loss of consciousness, and they also must cause unconventional behavior or significant interference with activity.

Although plaintiff told Dr. Hollenbeck in April 2003, that she was having seven to ten seizures a day, these seizures were not witnessed by Dr. Hollenbeck and no one other than plaintiff testified as to the seizures (in fact, no one other than plaintiff ever reported these seizures to any doctor). The listing requires either that a doctor witness the seizures or a person other than the claimant testify about the seizures. There was no testimony from anyone but plaintiff.

The seizures plaintiff reported during her July 2003 visit consisted of spells during which she would stare. This type of seizure does not satisfy the listing requirement. Additionally, no doctor witnessed the seizures and there was no testimony from anyone other than plaintiff about these seizures.

By December 2003, plaintiff's seizure disorder was stable. Four months later she reported that she had had "a spell." About five months later her seizure disorder was "well controlled." Four months later, it was again noted as "well controlled." Five months later her seizure disorder was described as "stable." Five months after that, "stable." Four months later, "stable." Five months later plaintiff said her seizures were "doing OK."

And five months after that Dr. Hollenbeck described her seizures as "stable, well controlled."

Because (1) no doctor ever observed plaintiff having a seizure, (2) no one other than plaintiff testified as to the description of type and frequency of plaintiff's seizures, (3) there is no evidence of any unconventional behavior or significant interference with activity during the day, and (4) the record does not establish seizures occurring more frequently than once weekly in spite of at least three months of prescribed treatment with alteration of awareness or loss of consciousness, plaintiff's impairment did not meet or equal listing 11.03. Therefore, her motion for summary judgment on this basis will be denied.

### VIII. OPINION OF DR. HOLLENBECK

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Hollenbeck who rendered opinions of February 2, 2004, and again on February 14, 2007. In those opinions, he found that plaintiff could sit for a total of one hour per day and walk or stand for a total of one hour per day.  In 2004 he found that plaintiff would need to alternate sitting and standing every 15 minutes.  But in 2007, he found that plaintiff would need to alternate sitting and standing every hour.

The ALJ found that plaintiff retained the residual functional capacity to lift and carry up to ten pounds; stand and walk no more than two hours total in an eight-hour day with normal breaks; sit no more than six hours total in an eight-hour day with normal breaks; and push and pull without limitation. He found that plaintiff could do no climbing; could occasionally balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to fumes and odors; should not work around hazards such as unprotected heights or around dangerous or moving machinery; should be afforded a sit-stand option a will; and is limited to simple, unskilled, repetitive job tasks. With respect to Dr. Hollenbeck, the ALJ stated:

> Overall, the undersigned finds that the previously-cited assessments of Dr. Hollenbeck are not consistent with the medical treatment records as previously discussed including the treatment records from that physician. Moreover, they are not consistent with claimant's lack of any ongoing medical treatment with respect to her complaints. As previously referenced, claimant has not followed up with Dr. Zipfel, her neurosurgeon, since 2005. The undersigned, overall, notes that Dr. Hollenbeck renders an opinion on the ultimate issue of disability and ability to engage in gainful activity under the Social Security Act, all of which is reserved to the Commissioner. Accordingly, the previously-cited assessments of Dr. Hollenbeck are being accorded little weight.

(Tr. at 31).

The only relevant limitations, i.e., the only ones affecting plaintiff's ability to work, are her ability to sit, stand, walk, see, and tolerate exposure to noise. The ALJ found that

plaintiff could work as an optical goods processor which requires moderate exposure to noise, frequent near visual acuity, the ability to sit for most of the time, and the ability to stand or walk for brief periods of time.  Although plaintiff argues in her brief about her ability to tolerate exposure to vibration, fumes, etc., and her ability to balance, the optical goods processor position does not require those abilities and they are therefore irrelevant.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician:  (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) – (5).

**1.  Length of treatment relationship.** The records of plaintiff's visits to Dr. Hollenbeck span from June 21, 2001, to December 11, 2006.

**2.  Frequency of examinations.** Dr. Hollenbeck treated plaintiff regularly.  However, he typically only saw plaintiff every five to seven months.

**3.  Nature and extent of treatment relationship.** Plaintiff saw Dr. Hollenbeck for treatment of her seizures, which is one of the bases for her disability application.

**4.  Supportability by medical signs and laboratory findings.** As noted by the ALJ, Dr. Hollenbeck's records do not support the findings which are relevant to plaintiff's motion.

*Sitting*.  Dr. Hollenbeck found that plaintiff could sit for a total of one hour per day.  I have not been able to find one record wherein plaintiff complained to Dr. Hollenbeck of any difficulty sitting.  Dr. Hollenbeck never recommended that plaintiff limit her sitting.

*Standing/Walking*.  Again, plaintiff never complained to Dr. Hollenbeck of any difficulty standing or walking, and Dr. Hollenbeck never recommended that she limit her standing or walking.  There is no indication that plaintiff's seizures or back pain affected her ability to stand or walk.  Plaintiff was not treated by Dr. Hollenbeck for any other symptom that would

severely limit her ability to stand or walk as found by Dr. Hollenbeck.

*Noise*.  Plaintiff never complained to Dr. Hollenbeck that noise caused problems for her, nor did he ever recommend that she avoid noise.  Further, Dr. Hollenbeck found in 2004 that plaintiff should avoid concentrated exposure to noise, then in 2007 he found that she should avoid even moderate exposure to noise.  There is no indication in his records of what happened during those three years to limit even further plaintiff's ability to tolerate noise.  A review of the visits between those two opinions shows the following:

- On 9/9/2004 plaintiff's seizure disorder was well controlled and she did not complain of any headaches or anything else which could be affected by noise.

- On 1/26/2005 plaintiff's seizure disorder was well controlled and she did not complain of any headaches or anything else which could be affected by noise.

- On 6/2/2005 plaintiff had been having no seizures but she had been having headaches.  Dr. Hollenbeck did not even assess headaches much less recommend any treatment for them, and noise was not discussed as either a complaint or something that should be limited.

- On 10/20/2005 plaintiff continued to report having "no seizures" although she continued to have headaches.  Again, Dr. Hollenbeck neither assessed nor recommended treatment for headaches, and noise was not mentioned.

- On 2/23/2006 Dr. Hollenbeck assessed "seizures, stable." Plaintiff reported daily headaches for which she took over-the-counter Excedrin.  Dr. Hollenbeck did not assess nor did he recommend any treatment.  Noise was not discussed.

- On 7/10/2006 plaintiff reported that her seizures were doing OK although she continued to have daily headaches. Dr. Hollenbeck finally diagnosed headaches; however, he offered no treatment and told plaintiff to return in six months.

- On 12/11/2006 Dr. Hollenbeck assessed seizures, stable, well controlled. He did not assess headaches, nor did anyone discuss noise.

That is the extent of plaintiff's visits with Dr. Hollenbeck between the two opinions at issue. Nowhere do his treatment records address the issue of noise, either as a complaint or as a recommendation. There simply is no evidence in Dr. Hollenbeck's treatment notes to support his recommendation that plaintiff avoid even moderate exposure to noise.

Furthermore, the ALJ found that plaintiff could perform the job of surveillance system monitor, and that job requires no exposure to noise.

*Visual limitations*. The optical goods processor position and the surveillance system monitor position require frequent near acuity. The telephone solicitor position requires only occasional near acuity, defined as up to 1/3 of the time.

Dr. Hollenbeck noted that plaintiff had visual limitations without explaining what those limitations are or on what he based that opinion. A review of Dr. Hollenbeck's treatment records reveals no limitations based on plaintiff's ability to see:

- On 2/12/2003 there were no complaints of visual difficulties.

- On 4/23/2003 she reported some double vision; however, Dr. Hollenbeck did not assess or treat any visual deficit.

- On 7/30/2003 there were no complaints of visual difficulties.

- On 12/11/2003 there were no complaints of visual difficulties.

☐ On 4/2/2004 Dr. Hollenbeck completed the first RFC assessment and found that plaintiff had no visual limitations.

- On 4/21/2004 there were no complaints of visual difficulties.

- On 9/9/2004 there were no complaints of visual difficulties.

- On 1/26/2005 plaintiff complained of occasional double vision. Dr. Hollenbeck did not assess any visual condition, did not treat plaintiff for any visual condition, did not make any changes in her medication, and did not recommend that she see any other medical professional for any visual symptoms.

- On 6/2/2005 there were no complaints of visual difficulties.

- On 10/20/2005 plaintiff reported double vision but there is no indication of how often or to what degree. Dr. Hollenbeck did not assess any visual condition, did not treat plaintiff for any visual condition, did not make any changes in her medication, and did not recommend that she see any other medical professional for any visual symptoms.

- On 2/23/2006 there were no complaints of visual difficulties.

- On 7/10/2006 there were no complaints of visual difficulties.

- On 12/11/2006 plaintiff complained of double vision "not every day". Again, there was no indication as to what extent or whether this caused plaintiff any problems. Dr. Hollenbeck did not assess any visual condition, did not treat plaintiff for any visual condition, did not make any

changes in her medication, and did not recommend that she see any other medical professional for any visual symptoms.

▫ On 2/14/2007 Dr. Hollenbeck completed the Medical Source Statement checking "yes" to the question whether plaintiff had any visual limitations.

Dr. Hollenbeck found that plaintiff had no visual limitations in his first opinion despite plaintiff having reported double vision previously. Subsequent to that opinion, nearly three years elapsed before the second opinion was rendered (which included a visual limitation). Yet during that three years, plaintiff complained of double vision on only three occasions. Plaintiff was never diagnosed with any visual limitation, the records do not reflect that she was unable to perform any activity because of the double vision, plaintiff was never treated for double vision, and Dr. Hollenbeck never recommended that plaintiff see any other medical professional about her double vision. There simply is nothing in his own medical records to substantiate the visual limitation he found as reflected in the 2007 Medical Source Statement.

**5.    Consistency of the opinion with the record as a whole.**

No other doctor diagnosed or treated plaintiff for any visual impairment. Lack of treatment is inconsistent with the finding of a disabling impairment. <u>Jones v. Chater</u> 83 F.3d 823, 826 (8th Cir. 1996). In addition on December 16, 2005, plaintiff reported in a patient history at Liberty Orthopedics that she had not had

69

nor did she presently suffer from visual loss.  Again on June 22,
2006, plaintiff reported that she had not had nor did she
presently suffer from visual loss.

Plaintiff never complained to any doctor about problems
tolerating noise, and no doctor ever recommended that plaintiff
in any way limit her exposure to noise.

Plaintiff never complained to any other doctor of an
inability to sit, stand, or walk, and no doctor ever recommended
that plaintiff limit her sitting, standing, or walking.

**6.    Specialization of the doctor.** Dr. Hollenbeck is a
neurologist.

In order to find that the ALJ erred in discrediting the
opinion of Dr. Hollenbeck, I must find that the substantial
evidence in the record supports a finding that plaintiff can sit
for no more than one hour per work day and stand or walk for no
more than one hour per work day.  There is simply nothing in the
record to suggest that plaintiff either lies down or reclines
nearly all day long.  She does not allege this in her
administrative paperwork, nor did she so testify.  Plaintiff did
not allege in her testimony or her administrative paperwork that
she cannot tolerate noise.  And plaintiff was never, during all
of the years covered in this transcript, treated for any visual
problems.

A physician's conclusory statement of disability without supporting evidence does not overcome substantial medical evidence supporting the Commissioner's decision. Loving v. Dept. of Health and Human Services, 16 F.3d 967, 971 (8th Cir. 1994); Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992). An opinion by a doctor that a claimant cannot work is not a medical opinion. House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination"); Baker v. Barnhart, 457 F.3d 882, 894 (8th Cir. 2006) (A physician's opinion regarding a claimant's ability to find work within a particular classification is not a "medical opinion"); Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995) (An opinion as to whether a claimant can find work or be gainfully employed is outside the province of medical doctors). Although Dr. Hollenbeck did not specifically say that plaintiff cannot work, a finding that a person can only sit, stand, and walk for a total of two hours per day is synonymous with being unemployable.

Based on all of the above, I find that the ALJ did not err in discrediting the opinion of Dr. Hollenbeck.

## IX.  CONCLUSIONS

Based on all of the above, I find that substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 31, 2010